## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                      Case No.:  2:08-cr-91-FtM-99SPC

GABRIEL BARRUETA

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on Motion to Suppress Statements and Evidence (Doc. #22) filed on August 15, 2008.  The Government filed its Response (Doc. #24) on August 27, 2008.  A hearing was held before the undersigned on August 29, 2008.  The Defendant was present and represented by retained counsel Miguel C. Fernandez, III.  The Government was represented by Assistant United States Attorney Jesus Casas.

The Defendant claims that all evidence seized as a result of a traffic stop of the Defendant's truck and/or the detention of his person were in violation of his rights against unreasonable searches and seizures.  He argues that any statements, admissions or confessions were obtained in violation of his privilege against self-incrimination and his right to counsel.  The Defendant further argues that any and all evidence seized as a result of any involuntary consent or actual acquiescence to government authority was tainted or otherwise in violation of established legal precedent.

The Government responds that the traffic stop was as a result of the officer having probable cause, and that this was followed by a consensual encounter and investigative detention.  The

Government argues these were not unreasonable nor unlawful.   Further, the Government asserts the totality of the circumstances surrounding the consent to search the Defendant's vehicle were not so coercive as to render it involuntary.   Finally, the Government asserts the Defendant has failed to allege facts regarding his statements, admissions or confessions that would tend to show his rights were violated and, therefore, the statements should not be suppressed.

## TESTIMONY AND EVIDENCE

The Government called three witnesses:  Special Agent Christopher Brown, Trooper Michael L. Merritt, and Agent Shawn Mullin.  The Defense recalled, Trooper Michael L. Merritt, and called the Defendant, Gabriel Barrueta,  and his wife, Espearanza Barrueta.  The Government called Trooper Michael Grider in rebuttal.  The Government also introduced two exhibits: a surveillance DVD, and a copy of the Faulty Equipment Notice issued to Gabriel Barrueta.

**Special Agent Christopher A. Brown:**   (Tr.4-25)

Christopher Brown ("Spec. Agt. Brown") is employed as a special agent with  Immigration and Customs Enforcement since it was formed on September 11, 2001, and prior to that with Customs for a total of approximately 20 years.  (Tr. 4:17-22).  On August 11, 2006, he conducted surveillance at a business site in the vicinity of Jet Loop Parkway in Lee County, Florida.  (Tr. 4:23-25, 5:1-7).  Spec. Agt. Brown was in a surveillance vehicle equipped with cameras and videotape equipment approximately 80 yards from where the Pronto Cash vans park in the parking lot. (Tr. 5:10-15).  He was operating two video cameras - one which was set for a wider view so that he could record the vehicle traffic in and out and people walking around in the parking lot, and a second which had a  tighter view that could zoom in on specific cash vans or people.  (Tr. 5:18-25).  Spec. Agt.

Brown identified the Defendant, Gabriel Barrueta, as being present on a videotape clip[1] from 1:06 - 1:14 pm on August 6, 2006, the date of the surveillance.  (Tr. 6:13-25, 7:1-2).

Spec. Agt. Brown described witnessing the Defendant arrive in his vehicle, exit his vehicle, walk to the Pronto van, place something into the cash drawer on the side of the van, and receive a 2 inch thick  8" x 12"  brown manila envelope from the driver's side door.  (Tr. 8 - 12).  Spec. Agt. Brown reported his observations to the surveillance team and the case agent, Agent Sean Mullin ("Spec. Agt. Mullin"), via radio and Nextel.  (Tr. 15:6-9).

**Trooper Michael Merritt:**   (Tr. 26 - 69, 116 - 120)

Trooper Michael Merritt ("Trooper Merritt") has been with the Florida Highway Patrol for approximately 10 years.  (Tr.  27, 4-6).  He testified that he is assigned to Lee County to enforce traffic laws and all other laws of the state of Florida.  (Tr. 27:7-12).  He was on patrol on August 11, 2008, when he received a Nextel communication from Spec. Agt. Sean Mullin.  (Tr. 28:20-25, 29:1-4).  He was advised  about a silver truck with flames on the side which was leaving the surveillance area.  (Tr. 29:6-9).  When he got behind the vehicle, he noticed that the window tint was blacked out and was extremely dark .  (Tr. 29:12-13).  He was unable to observe anything in the vehicle except an outline of the driver from the front windshield.  (Tr. 29:14-18).  Based upon his observations, he effected a traffic stop of the vehicle.  (Tr. 30:2-5).  He testified that he was not ordered to stop the vehicle other than to be instructed that if he found probable cause to stop the vehicle, to stop it.  (Tr. 30:6-15).

Trooper Merritt indicated that after stopping the vehicle, he exited his patrol car and approached the passenger side.  (Tr. 31:5-7).  At that time, the driver rolled the window down.  He

---

[1]The DVD clip was introduced as Government's Exhibit #1.

had the driver roll the window back up halfway so that he could apply his tint meter.[2]  He explained

how the meter worked,  the legal limit for tint in the state of Florida, and explained to the driver that

his tint measured two percent which under Florida law is a violation.  (Tr. 32:10-16). He also asked

the driver for his license, registration, and insurance.  (Tr. 31:5-14).  He had the driver step out of

his vehicle, come back to the police car, and issued him a warning[3] for the illegal tint.  (Tr. 32:17-20).

Trooper Merritt testified as to how the warning was generated.[4] (Tr. 35:1- 25, 36:1-8).  The warning

was generated at 1:25 pm.  (Tr. 53:4-9).  Trooper Merritt indicated that he stops between 10 and 20

cars a night and that a quarter to a half of them are for window tint violations.  (Tr. 41:17-20).

During the traffic stop, Trooper Merritt was training Trooper St. Clair.  (Tr. 31:15-25, 32:1-

5).[5]  Trooper Grider and Agent Mullin arrived about the same time, shortly after the stop.  (Tr. 32:22-

25, 42:9-12, 43:20-22).

During the traffic stop, Trooper Merritt had the opportunity to observe the Defendant.  He

appeared to be restless and nervous, but was polite.  (Tr. 33:6-10).  Based upon his observations, he

asked the Defendant if he had any drugs, weapons, or anything illegal in his vehicle.  (Tr. 33:11-15).

The Defendant indicated, "no."  (Tr. 33:17).  Trooper Merritt finished writing the warning, printed

---

[2]A tint meter is a device or an instrument used to measure the light transmittance of a window. The instrument tests the window tint in order to give a percentage of light transmitted through the window.  The tint meter is tested yearly using glass certified to a specific measurement or percentage. The instrument is calibrated daily by the officer.  (Tr. 27 - 28).

[3]The warning was introduced as Government's Exhibit #2.

[4]Trooper Merritt testified that a program called Smart Cop is utilized to produce citations, warnings, arrest and incident reports.  When the program is opened, it generates the time and date. The officer will then cut and paste all information from the Florida registration and Florida license into the form.

[5]Trooper St. Clair is currently deployed with the U. S. Navy to Iraq or Afghanistan.

it, handed it to the Defendant, and returned the Defendant's license and registration. (Tr. 33:17-20). At that time, Trooper Merritt asked the Defendant specifically about having currency in his vehicle to which the Defendant replied that he had money in the vehicle. When he was asked how much, the Defendant replied "approximately one hundred thousand dollars." (Tr. 33:21-24). Based upon the response, Trooper Merritt asked the Defendant if he could search his vehicle. (Tr. 34:2). The Defendant indicated that he could by stating "Absolutely, yes, go ahead." (Tr. 34:3-4, 37:1-6). Trooper Merritt spoke to the Defendant in English. The Defendant did not appear to have any difficulty understanding him. (Tr. 37:7-11). He testified that he did not threaten the Defendant in any way to get him to consent to the search of the vehicle. (Tr. 37:17-19). There was a female passenger in the vehicle whom he had step out so that he could conduct the search. (Tr. 37:12-25, 38:1-7). At no time did the Defendant withdraw his consent to the search of the vehicle. (Tr. 65:8-10).

During the course of the 20 second search of the vehicle, Trooper Merritt located a large manila envelope in the center console area. (Tr. 28:8-15). Written in ball point pen on the outside of the envelope was 139,000. (Tr. 38:18-21). He looked inside the envelope to verify there was money inside, closed it up, returned to his patrol car, and notified Spec. Agt. Mullin about his findings. (Tr. 38:22-25, 39:1-2). When asked about the money, the Defendant said that he was transporting it to pay his workers. (Tr. 39:9-12).

Trooper Merritt testified he contacted Spec. Agt. Mullin because of the large amount of currency, as well as the type of investigation that he knew him to be conducting about immigrants working illegally and getting paid with cash. Since the Defendant advised that he was going to pay

his workers, and he had a large amount of cash, he felt that it coincided with what he knew of the general details of the investigation.  (Tr. 41:1-9).

Trooper Merritt wrote an offense incident report in this case.  The time on the report indicates 14:21 which Trooper Merritt testified was the time at which he opened the offense incident report. This time is generated by the computer similar to the way it is generated for the warning.  (Tr. 67:19-22, 69:5-10).  However, he testified that he actually seized the currency at 1:26 or 1:27. (Tr. 69:14-16).

Spec. Agt.  Mullin responded to the scene.  It took him about three (3) minutes from the time Trooper Merritt called him and asked him to respond.  (Tr. 40:11-14).  Trooper Merritt turned the recovered currency over to Spec. Agt. Mullin.  (Tr. 41:21-23).  After Spec. Agt. Mullin arrived, he identified himself to the Defendant, showed him his credentials, and read him his <u>Miranda</u> warnings. (Tr. 40:17-20).

**Spec. Agt. Sean Mullin:**  (Tr. 70 - 115)

Sean Mullin is a Special Agent for the Immigration and Customs Enforcement Agency and has been serving in that capacity for five (5) years.  Prior to that,  he was with the Florida Department of Law Enforcement for two (2) years, and prior to that, he served as a detective for the Syracuse, New York, Police Department for nine (9) years.  (Tr. 70:20-25, 71:1-4).

Spec. Agent Mullin testified that on August 11, 2006, he was conducting a large-scale investigation centered around an illegal check cashing/Worker's Comp insurance scam which was being utilized for the facilitation of payment of illegal alien workers in the construction industry.  (Tr.

71: 11-17). [6] On August 11, 2006, they were conducting surveillance to generate information on how the process was going and to identify possible people involved in the check cashing/payment of illegal alien workers. (Tr. 73:13-19). They were looking for persons that were making transactions at the check cashing facility. They believed that the individuals were handing off checks and receiving currency. They were following people from the area of where the vans were parked and getting license plate numbers. They would also see where they would go and what their activities were after they left the check cashing van. (Tr. 75:2-8).

On August 11, 2006, Spec. Agt. Mullin received a communication from Spec. Agt. Brown regarding his observations at the Pronto check cashing van. (Tr. 76:19-25). He then relayed that information via Nextel to Trooper Merritt indicating there was a vehicle leaving. (Tr. 77:1-2). He told Trooper Merritt that if he saw a violation and he felt he could pull the vehicle over based on probable cause then he should do so, and should identify the driver. (Tr. 77:3-8). He received notification from Trooper Merritt via Nextel that he had conducted a traffic stop after observing a

---

[6]On August 11, 2006, his knowledge of the scheme was that there was a check cashing entity which had been identified as Pronto Cash that was facilitating the whole process. The entity on paper would declare themselves to be a construction company. That company would incorporate with the state. They would get the proper business licenses and they would obtain a Workers' Compensation policy allowing them to work. Some of the companies were identified as shell companies who would obtain a Workers' Compensation policy and then would offer it for rent to people who were unable to obtain their own Workers' Compensation policy or who did not want to obtain a Workers' Compensation policy due to the cost. For a fraction of what it would cost to be legitimate, the shell organizations could rent their proof of insurance. This proof of insurance is required to obtain a job in the construction industry. Pronto Cash had become known during the investigation as being a company that wouldn't ask any questions. They also facilitated the recruitment of the shell companies. They would set up in different locations throughout the state. In our area, they would set up off Jet Port Parkway in Fort Myers and would have representatives from the shell companies outside their vans meeting clients, passing out cards, and talking to people to recruit additional business for themselves. Through the investigation, it was determined that Pronto would collect the commission that these shell companies were earning. Pronto was also found to be complicit in that they would cash checks without proper endorsements. (Tr.71:21-25, 72:1-25, 73:1-12).

tint violation.  Trooper Merritt also relayed the fact that the individual in the vehicle indicated  he had over a hundred thousand dollars in his car.  (Tr. 78:12-16).  Spec. Agt. Mullin then drove to the scene of the traffic stop, approximately a mile from where he was located.  (Tr. 78:16-22).  Spec. Agt. Mullin testified that he got to the scene of the traffic stop at approximately 1:25pm.  (Tr. 79:4-5).

When he arrived at the stop, he noticed Trooper Merritt, Trooper Grider, and Trooper St. Clair standing on the side of the road with the Defendant standing in front of them.  (Tr. 79:13-17).  The Defendant had paperwork in his hand - his license and a warning.  (Tr. 80:21-22).  He approached the Defendant, identified himself, showed him his credentials, explained who he was, explained to him that he was conducting an investigation, and described the nature of the investigation.  Spec. Agt. Mullin asked the Defendant if he would like to answer some questions regarding the cash that was found in his vehicle.  (Tr. 81:2-9).  It was at that time that he read the Defendant his Miranda warnings in English.  (Tr. 81:10-16).  The Defendant had been speaking fluent English with the officers.  (Tr. 81:18-19).  The Defendant appeared to understand the warnings and agreed to speak with him.  (Tr. 81:21-25).  At no time did he threaten the Defendant.  (Tr. 83:22-24).  He believes that he spoke with the Defendant for approximately 20 minutes.  (Tr. 82:22-24).  The Defendant never indicated that he no longer wished to answer questions.  (Tr. 83:1-3).  In fact, during one point in the conversation, the Defendant admitted that the workers he was paying were illegal aliens and that they were being paid in cash.  He also admitted to renting the Workers' Compensation proof so that he didn't need to get his own insurance.  (Tr. 83:4-15).  As a result of the investigation and discussions with the Defendant, the currency was confiscated but the Defendant was not arrested and was allowed to leave.  (Tr. 84:19-25, 85:1- 10).  According to the property report and documents, the currency was seized around quarter to two in the afternoon.  The Defendant left the

scene about five minutes later.  (Tr. 85:14-18).  He was given a copy of the seizure documents before

he left  the scene.  (Tr. 100, 4-7).

**Gabriel Barrueta:**   (Tr. 121 - 155)

The Defendant testified that on August 11, 2006, he was traveling north on I-75 when he

noticed a patrol car behind him with its lights on.  (Tr. 122:11-14).  He testified that a trooper

approached his vehicle on the driver's side.  (Tr. 123:22-24).  He was asked for his license and

registration.  (Tr. 124:5-10).  The trooper then checked his window tint. (Tr. 124:13-17).  After the

trooper checked his window, he was asked to get out and the trooper would give him a warning to

fix the window tint. (Tr. 126:8-9).  When he went to the patrol car, there were other agents or police

there. (Tr. 126:2-10).  They got "more or less two feet" from him and positioned themselves some

in front of him and some behind him.  (Tr. 126:15-24).  He did not feel that he was free to leave at

that point. (Tr. 127:13-15).  The officer still had his license and registration. (Tr. 127: 16-21).  He

was asked if he was carrying anything illegal in his truck. (Tr. 127:22-24).  They also asked him if he

had drugs, weapons, or money. (Tr. 128:11-12).  Defendant Buerreta testified that when he asked

the officers why they were asking him if he had any money, they told him "that if they entered the

truck and found something in there, that things would go bad."   (Tr. 128:20-22).  He felt that his

vehicle was going to be searched - "They were going to do it." (Tr. 129:2-3).  He felt pressured.

(Tr. 129:15-20).  When they asked him how much money he was bringing, he told them he had over

a hundred thousand dollars. (Tr. 129:23-23, 130:1-2).  They said they were going to go search the

truck.  (Tr. 130:4-11).  The Defendant testified that the agent asked him if they could search his

truck.  He responded that they already had him there, they were going to do it anyway. (Tr. 130:12-

16).  He testified that if he had  a choice, he would not have let them search his vehicle. (Tr. 130: 20-

22). The Defendant testified that the officers never advised him of his right to remain silent or that he had a right to an attorney. (Tr. 130 23-25, 131:1). There were three (3) or four (4) officers who searched his truck. (Tr. 131:6-8). He also testified that three (3) or four (4) officers stayed back at the police car with him. (Tr. 131:9-10). Defendant Barrueta testified that he answered the questions that were put to him because the officers were in front of him and that he felt that he had "no chance" which to him meant that he felt pressured to answer what they were asking. (Tr. 133:1-12). They retained his documents until the time they let him go. (Tr. 133:23-25). He never felt free to leave. (Tr. 134:1-3). He was not given the warning or his papers until the very end, about an hour later than the stop. (Tr. 134:19-25, 135:1-12).

On cross examination by the Government, the Defendant testified there were six (6) officers surrounding him. (Tr. 136:12-16). There were four (4) police vehicles at the scene two (2) were marked state trooper patrol vehicles, one (1) was a white car, and the other was a Suburban or truck. (Tr. 139:5-18). The Defendant testified that Spec. Agt. Mullin was driving the white vehicle. (Tr. 139:19-23). He testified that the first state trooper patrol vehicle was parked fifteen (15) to twenty (20) feet away from his vehicle. Spec. Agt. Mullin's vehicle was parked behind that vehicle, and another state trooper patrol car was parked immediately behind Spec. Agt. Mullin. (Tr. 140: 18-24). The Suburban was located on the other side of Spec. Agt. Mullins' white car. (Tr. 140:25, 141:1).

During the hearing, the Defendant used an interpreter to translate the questions and offer his responses. When questioned about his ability to speak English, he stated he understood a little bit of English but not enough to converse with someone about the law. (Tr. 141: 7-10). He testified that he understood most of what was asked of him during the stop but qualified the understanding by saying "[w]ell everything that is police, I don't understand any of that." (Tr. 141:11-16). However,

the Defendant stated that he understood he was pulled over by the police for a window tint violation. (Tr. 141:17-21).  The Defendant also understood when the police asked him to go back to the patrol car. (Tr. 141: 22-24).  The Defendant further testified he understood enough English to perform his job.  For example, the terms shovel, wheelbarrow, or to prepare the mix. (Tr. 143:1-7).

The Defendant denied he ever told Spec. Agt. Mullin that he was a subcontractor for Mesa Construction. (Tr. 144:2-4).  He further denied ever telling Spec. Agt. Mullin that he had been hired by three (3) other construction companies: Tarpon Bay Homes, Wheeler Brothers Construction, and New Century Homes. (Tr. 144: 5-15).  The Defendant stated that Mesa Construction performed that work, not him. (Tr. 144:14-16).  The Defendant acknowledged that he had given the names of those companies to Spec. Agt. Mullin. (Tr. 144: 22-23).  The Defendant also acknowledged that he told Spec. Agt. Mullin that he received five percent (5%)  commission for cashing payroll checks but denied telling Spec. Agt. Mullin that he made payroll disbursements from his residence. (Tr. 144:24-25, 145:1-14).  However, the Defendant acknowledged that he began cashing, transporting, and dispensing payroll for Tarpon Bay Homes, Wheeler Brothers Construction, and New Century Homes on a weekly basis approximately two (2) months prior to date of the traffic stop. (Tr. 145:22-25, 146:1-3).  The Defendant stated that he never told Spec. Agt. Mullin that he paid Mesa five percent (5%) to use its workers compensation insurance certificates.  (Tr. 146:9-25 - 148:1-7).  The Defendant then clarified stating that those companies never paid him, only Mesa Construction paid him. (Tr. 148:2-7).  He only mentioned those companies because Mesa worked for those companies. (Tr. 148:6-12).

**Espearanza Barrueta:**  (Tr. 156 - 176)

Espearanza Barrueta ("Mrs. Barrueta") is the wife of the Defendant Gabriel Barrueta.  She testified that on August 11, 2006, she and her husband were stopped by the police around one o'clock in the afternoon. (Tr. 156:9-17).  Mrs. Barrueta said the Defendant was driving and that she was in the passenger seat and her three (3) year old son was riding in the back seat. (Tr. 156:13-24).

Mrs. Barrueta testified that a highway patrol officer pulled her and her husband over as they approached I-75.  The officer approached the driver's side of the vehicle. (Tr. 157:15-17).  The officer asked the Defendant for his license and the vehicle's registration. (Tr. 157:21-24).  The officer took the Defendant's license and registration to his patrol car. (Tr. 158:2-5).  The officer then returned back to Barrueta's truck and approached the driver's side with a tint meter. (Tr. 158:6-12).  The officer then placed the tint meter on the driver's side window, however, Mrs. Barrueta could not see whether or not the instrument measured anything. (Tr. 158:16-21).  After the officer finished with the tint meter, he asked the Defendant to exit the vehicle. (Tr. 158:22-23).  The Defendant exited the truck while Mrs. Barrueta remained inside the passenger cabin. (Tr. 158:24-25, 159:2).    M r s . Barrueta stated she used the truck's cosmetic and side mirrors to watch the Defendant walk back by the patrol cars. (Tr. 159:3-25, 160:9).  The Defendant had five (5) or six (6) officers standing around him that appeared to be speaking with him, although she testified  she could not hear what was being said by the officers. (Tr. 160:10-23).

An officer then tapped on her window and asked her to get out of the vehicle. (Tr. 161:1-5).  He helped her get her son out of the back seat. (Tr. 161:8-15).  She and her son remained outside of the truck. (Tr. 161:17-19).  She believed the stop lasted about an hour and a half. (Tr. 162:1-8).

Mrs. Barreuta testified the officer never asked her permission to search the truck and never asked her husband if he wanted to get out, but the officer did explain that he was going to give the

Defendant a warning ticket. (Tr. 163:4-8). Mrs. Barreuta further stated that she never heard the officers give the Defendant his <u>Miranda</u> rights or any rights, and they never asked his permission to search the truck. (Tr. 162:14-20). While she never saw the Defendant with the warning ticket in his hand, she did see the officer give the Defendant his license and registration back at the end of the stop. (Tr. 163:12-23).

Mrs. Barreuta then testified that after the officers removed her from the truck that two (2) or three (3) officers searched the truck. (Tr. 174:19-25 ). It only took the officers one (1) to three (3) minutes to complete the search. (Tr. 176:12-13). The other officers remained near the patrol car with the Defendant. (Tr. 175:1-2). After searching the truck, the officers removed a yellow envelope. (Tr. 176:6-11).

On cross examination, Mrs. Barreuta testified that she spoke very little English. (Tr. 164:10-15). She said she could recognize words like table, good afternoon, and good morning. (Tr. 164:10-15). She admitted that she would not have understood if the officers had asked her husband about his rights. (Tr. 164:10-19). Mrs. Barreuta testified the officer who approached the vehicle and asked the Defendant to get out was polite. (Tr. 170:5-9). Mrs. Barreuta further testified that she never saw the Defendant placed in handcuffs, and the officers never drew their guns. (Tr. 172:1-4).

**Trooper Michael Grider**: (Tr. 177 - 188)

Trooper Michael Grider ("Trooper Grider") has served with the Florida Highway Patrol since November 14, 1994. (Tr. 177:19-20). He participated in the investigation on August 11, 2006. (Tr. 177:21-25, 178:1-2). Trooper Grider testified that he was back-up on the stop of the Defendant's truck by Trooper Merritt. (Tr. 178:5-9). Trooper Grider stated that when he arrived at the scene, he saw Trooper Merritt standing with a male and a female. (Tr. 178: 15-18). According to Trooper

Grider, he arrived on the scene approximately two (2) to three (3) minutes after being called for back-up by Trooper Merritt. (Tr. 179:11-16).   There were no other uniformed officers present besides Troopers Merritt, Grider and the Field Training Officer St. Clair. (Tr. 179:17-21, 180: 14-20). Trooper Grider also noted that Spec. Agt. Mullin pulled in right behind him in his unmarked ICE vehicle. (Tr. 179:22-25, 180:1-2).   In total, Trooper Grider testified there were three (3) cars at the scene, two (2) state trooper patrol cars and Spec. Agt. Mullin's unmarked car. (Tr. 180: 6-11). Trooper Grider was driving a marked State Highway Patrol SUV. (Tr. 180: 6-9). Trooper Merritt already had the package of money out of the truck when Trooper Grider arrived on the scene. (Tr. 180: 23-24).   Trooper Grider was not present when Trooper Merritt searched the Defendant's truck and retrieved the envelope of money. (Tr. 180: 25, 181:1-4).

Spec. Agt. Mullin approached the Defendant and began speaking with him. (Tr. 181:5-10). Trooper Grider was standing about four (4) or five (5) feet away from Spec. Agt. Mullin and the Defendant. (Tr. 181:20-21).   He testified he heard Spec. Agt. Mullin give the Defendant his Miranda warnings. (Tr. 181: 11-15).   He further stated that the Defendant spoke "perfectly good English and had no trouble communicating with Spec. Agt. Mullin. (Tr. 181:16-19).

Everyone was standing on the passenger side of Trooper Merritt's patrol car, in front of the door. (Tr. 181:22-25).   According to Trooper Grider, it is standard operating procedure for state troopers to stand on the passenger side of the vehicle to prevent anyone from being run over. (Tr.182:1-7). While all of the people were standing outside of their respective vehicles when Trooper Grider arrived, due to the heat, Mrs. Barreuta and her son were allowed to go back inside the truck after a quick search. (Tr. 182:12-22).   Trooper Grider described the Defendant as "fidgeting and

-14-

nervous" throughout the duration of the stop. (Tr. 183:3-5).  No firearms were drawn during the stop. (Tr. 183:1-2)

## DISCUSSION

The Defendant argues that he was improperly stopped and detained by the Florida State Highway Patrol and that any and all statements he made were in violation of his Fifth and Sixth Amendment Rights.  He further argues that any and all evidence recovered from his vehicle during the traffic stop was obtained by an illegal non-consensual search.

The Government responds that the Defendant was stopped pursuant to a valid traffic violation,  the Defendant consented to the search, and the Defendant was read his Miranda rights prior to being questioned by the Troopers and Spec. Agt. Mullin.

### (1) Credibility Analysis

Due to the conflicts between the testimony of the Defendant, Mrs. Barrueta, and the troopers and agents who testified, the Court must first make a credibility analysis prior to ruling on the issues raised in the Motion.  When weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing.  U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002).

In weighing the credibility of the witnesses in this case, the Court will look at the factors enumerated in Ramirez-Chilel,  as well as four (4) specific areas of conflict between the testimony of the troopers and that of Defendant Barrueta and his wife; (A) the number of officers present at the scene, their location, and demeanor; (B) whether or not the Defendant's documents were returned

after the traffic stop; (C) whether or not the Defendant was read his <u>Miranda</u> warnings; (D) and whether or not there was consent given to search the vehicle.

There is a conflict in the testimony regarding how many officer's were present at the scene, their positions and their demeanor. The troopers and Spec. Agt. Mullin stated there were four (4) officers present: Spec. Agt. Mullin, Trooper Merritt, Trooper Grider, and Trooper St. Clair. Troopers Merritt and Grider clearly identified the officers who were present at the scene and identified the type of vehicle each officer drove to the scene. (Tr. 61:9-11). None of the troopers indicate that they ever surrounded the Defendant nor intimidated him during the course of the traffic stop.

In contrast, the Defendant testified there were three (3) or four (4) officers who searched his truck. (Tr. 131:6-8). He also testified that three (3) or four (4) officers stayed back at the police car with him. (Tr. 131:9-10). Therefore, according to the Defendant's direct testimony, the Defendant believed there were between six (6) and (8) officers at the scene. (Tr. 131:6-10). During another part of his testimony, however, the Defendant stated that originally two troopers stopped him and another arrived later. This would clearly account for Troopers Merritt and St. Clair who made the initial traffic stop, and for Trooper Grider who arrived shortly thereafter. The Defendant contests that there were four (4) patrol cars at the scene. (Tr. 123:12-19). Mrs. Barrueta's testimony is also contradictory. She indicated on the witness stand that five (5) to six (6) officers were present. (Tr. 160:10-23).

The Defendant also appears to allege some type of intimidation. They got "more or less two feet" from him and positioned themselves some in front of him and some behind him. (Tr. 126:15-24). The Defendant claims the officers retained his documents until the time they let him go. (Tr. 129:15-

20).  He argues he was not free to leave because Trooper Merritt maintained control of his license and registration until the end of the encounter.  Trooper Merritt testified he finished the warning citation for the window tinting violation and returned the Defendant's license and registration prior to asking the Defendant if he could search the vehicle. (Tr. 33:17-20).   Spec. Agt. Mullin testified that when he arrived at the stop, he noticed Trooper Merritt, Trooper Grider, and Trooper St. Clair standing on the side of the road with the Defendant standing in front of them.  (Tr. 79:13-17).  The Defendant had paperwork in his hand - his license and a warning.  (Tr. 80:21-22).  Based upon the demeanor of the officers, the Defendant, and  the Defendant's wife on the stand, the Court finds the testimony of Trooper Merritt and Spec. Agt. Mullin to be more credible.

Regarding the issue of whether or not the Defendant was read his Miranda warnings, Trooper Merritt, Trooper Grider, and Spec. Agt. Mullin all stated that Spec. Agt. Mullin read the Defendant his Miranda rights. (Tr. 40:17-20, 81:2-16, 181:11-15).     The officers were consistent in their statements.

Defendant Barrueta testified that he was never read his Miranda warnings.  However, there is little evidence to support the Defendant's claim that he was not read his rights.  Mrs. Barrueta said she never heard the officers give the Defendant his Miranda rights, nor any rights.  (Tr. 162:14-20). On cross examination, Mrs. Barrueta admitted that she spoke very little English (Tr. 164:10-15) and that she would not have understood if the officers had asked her husband about his rights.  (Tr. 164:10-19).  She further testified that she could not hear what the officers were saying to the Defendant while they were behind the truck and she was still in the vehicle's passenger cabin.(Tr. 160:10-23).  Clearly, Mrs. Barrueta was not in a position to testify to this issue based upon her lack of proximity to the Defendant and the officers.  Therefore, the Court discounts the testimony of Mrs.

Barrueta on this issue.  Thus, based upon the demeanor of the witnesses as they testified from the witness stand, their interest in the outcome of the hearing, and the consistency of the testimony, the Court finds that the testimony of the Government's witnesses was more credible.  The Court, therefore, believes the Defendant was read his <u>Miranda</u> rights.

The issue of whether or not the Defendant gave his consent to have his truck searched is also contested by the Defendant.  The Defendant stated that his consent to search the truck was coerced because he did not feel that he was free to leave (Tr. 127:13-15), Trooper Merritt had his license and registration, (Tr. 127: 16-21) and he was surrounded by the officers. (Tr. 127: 16-21).  The Defendant further testified that when he asked the officers why they were asking him if he had any money, they told him "that if they entered the truck and found something in there, that things would go bad." (Tr. 128:20-22).  He felt that his vehicle was going to be searched - "They were going to do it." (Tr. 129:2-3).  Therefore, feeling he had no choice, he allowed the search.  He stated that he felt pressure to allow the search but he never stated that he informed the officers that he had a problem with the search.  He testified that if he had a choice, he would not have let them search his vehicle. (Tr. 130: 20-22).

Contrary to the Defendant's testimony, Trooper Merritt stated that when he asked the Defendant if he could search the truck, the Defendant indicated that he could by stating "[a]bsolutely, yes, go ahead." (Tr. 34:3-4, 37:1-6).  Trooper Merritt testified that the Defendant did not appear to have any difficulty understanding him when he spoke to him in English. (Tr. 37:7-11).  He did not threaten the Defendant in any way to get him to consent to the search of the vehicle and at no time did the Defendant withdraw his consent to search the vehicle. (Tr. 37:17-19, 65:8-10).  At no point in his testimony did the Defendant state that he refused the officers the right to search the vehicle

Furthermore, Trooper Merritt and Trooper St. Clair were the only officers present when the truck was originally searched. (Tr. 61:9-11).  Based upon the testimony presented, the Court finds the testimony of Trooper Merritt to be the more credible.

Overall, after listening to the testimony and after seeing the demeanor of the witnesses on the stand, as well as who has the most to lose in the outcome of the hearing, the Court finds that the testimony of the officers was more credible than the testimony of the Defendant and Espearanza Barrueta.

### (2) Whether the Traffic Stop was Valid

Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred, and an officer's motive in making the traffic stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment," U.S. v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (quoting Whren v. United States, 517 U.S. 806, 810-812, 116 S. Ct. 1769, 135 L. Ed.2d 89 (1996); see United States v. Roy, 869 F.2d 1427, 1431-33 (11th Cir. 1989) cert. denied, 493 U.S. 818, 110 S. Ct. 72, 107 L. Ed.2d 38 (1989) (holding the subjective belief of Coast Guard did not invalidate boarding, even where the officers themselves believed they did not have probable cause) See Fla. Stat. § 316.610(1)(an officer may at any time upon reasonable cause to believe that a vehicle is unsafe or that the equipment is not functioning properly, require the driver to stop in order to inspect the vehicle).  The Fourth Amendment test for a traffic stop should be whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Whren, 517 U.S. at 810-812.  Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or

reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-1662 (1996).

When Trooper Merritt observed the vehicle, he noticed that the window tint was blacked out and extremely dark. (Tr. 29:12-13). In fact, he was unable to observe anything in the vehicle except an outline of the driver from the front windshield. (Tr. 29:14-18). Based upon his observations, he effected a traffic stop on the vehicle. (Tr. 30:2-5). Trooper Merritt is an experienced officer regarding window tint violations. He testified that he stops between 10 and 20 cars a night and that a quarter to a half of them are for window tint violations. (Tr. 41:17-20). Florida law allows an officer to stop a vehicle in instances where the officer believes the vehicle's window tinting is too dark. State v. Moore, 791 So. 2d 1246 (Fla. 1st DCA 2001). Trooper Merritt measured the Defendant's window tint and received a two percent (2%) reading on the tint meter which under Florida law is a violation. (Tr. 32:10-16). Under Florida law, a vehicle's window must allow light transmittance at no less than 28%. *See* U.S. v. Weaver, 145 Fed. Appx. 639, 641 (11th Cir. 2005) (*citing* Fla. Stat. § 316.2953, holding that a traffic stop was supported by probable cause where the officer believed the vehicle's window tinting was in violation of Florida's legal limits)). As a result, Trooper Merritt had the driver step out of his vehicle, come back to the police car. He issued him a warning for the illegal tint. (Tr. 32:17-20).

Based upon Florida's Statutes and the relevant case law, Trooper Merritt did not violate the Fourth Amendment test for conducting a traffic stop for a window tint violation. The Court respectfully recommends that the traffic stop in this instance was valid.

### *(3) Whether the Defendant's Miranda Rights were Violated*

_____The Defendant states that he was never read his Miranda rights.  The Government responds Spec. Agt. Mullin read the Defendant his Miranda warnings prior to questioning him at the scene of the traffic stop.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966).  Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444.  The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per curiam*). A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980).  Some types of questions are not considered interrogations and therefore do not require Miranda warnings.  Courts have concluded that routine that general on-the-scene questioning is not interrogations for purposes of Fifth Amendment and Miranda warnings. *See* U.S. v. Ozuna, 170 F.3d 654, 657-659 (6th Cir. 1999) (holding that asking routine questions about a person's identity and

natural origin were not interrogations for <u>Miranda</u> purposes); *But see e.g.* <u>U.S. v. Gonzalez-Sandoval</u>, 894 F.2d 1043, 1046-1047 (9th Cir. 1990) (holding that an interrogation occurred where border agents had reason to believe that a person was entering the country illegally and therefore would incriminate themselves with their answers).

While the Supreme Court has said that the Fifth Amendment prohibits an officer from interrogating an arrestee without reading that arrestee his so-called <u>Miranda</u> rights, the rule extends only to the functional equivalent of an interrogation. <u>U.S. v. McKenzie</u>,132 Fed. Appx. 788, 789-790 (11th Cir. 2005) (*citing* <u>Innis</u>, 446 U.S. 299). But, voluntary statements-even those made without a <u>Miranda</u> reading-are admissible as long as they are given freely and voluntarily without compelling influences. <u>Id.</u> at 299-300; <u>Miranda</u>, 86 S.Ct. at 478.

In this instance, there are two circumstances that require the Court's review of Defendant's <u>Miranda</u> rights.  First, the statements made to Trooper Merritt prior to the search of the Defendant's vehicle, and second, the Defendant's interview with Spec. Agt. Mullin.

<u>(a) Statements Made to Trooper Merritt</u>

The initial question that must be asked is whether or not the Defendant was in custody at the time Trooper Merritt asked him if there was money in his vehicle.  "Custody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest." <u>Dexter v. Secretary, Dept. of Corrections</u>, 2008 WL 1956029 *8 (M.D. Fla. May 2, 2008).  In determining whether a person is in custody, the Court notes that "[a] person is in custody if a reasonable person placed in the same position would believe that his or her freedom of actions was curtailed to a degree associated with actual arrest." <u>Id.</u>  As noted above, a person is not considered to be in custody for <u>Miranda</u> purposes during a routine traffic stop.

Berkemer, 468 U.S. at 441; *See* 37 Geo. L.J. Ann. Rev. Crim. Proc. 172-173 (2008) (a brief but thorough discussion on when custody occurs for Miranda purposes).

Trooper Merritt testified that during the traffic stop, the Defendant's demeanor was restless and nervous. (Tr. 33:6-10). Based upon his observations, Trooper Merritt asked the Defendant if he had any drugs, weapons, or anything illegal in his vehicle. (Tr. 33:6-16). The Defendant indicated, "no." (Tr. 33:17). Trooper Merritt finished writing the warning for the tint violation, printed it, handed it to the Defendant and returned the Defendant's license and registration. (Tr. 33:17-20). At that time, Trooper Merritt asked the Defendant specifically about having currency to which the Defendant replied that he had money in the vehicle. (Tr. 33:21-24). When he was asked how much, the Defendant replied "approximately one hundred thousand dollars." (Tr. 33:21-24).

In this instance, Trooper Merritt had finished the warning citation for the window tint violation and had returned the Defendant's license and registration. (Tr. 33:17-20). Although the Defendant disputes the timing of when his documents were returned, the Court has already made a credibility determination in favor of Trooper Merritt and the other officers present at the traffic stop. Therefore, the Court believes that the Defendant's license, registration, and warning citation were given to him after the officer printed the warning citation and not, as the Defendant asserts, after the search and post-Miranda statements.

Under the circumstances presented in this case, a reasonable person would assume that after he was given the warning citation, and after he received his license and registration back, that he was free to leave. In fact, Trooper Merritt testified on cross examination that once he had written the warning citation and returned the Defendant's license and registration, the Defendant was free to leave. (Tr. 56:12-15). Where a reasonable person "would feel free to decline the officers' requests

or otherwise terminate the encounter," the encounter with the police is consensual, and the Fourth Amendment is not implicated. U.S. v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (citing Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)).  Thus, at that point, the conversation between Trooper Merritt and the Defendant became a consensual encounter.

     Questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.  Therefore, the Court respectfully recommends the Defendant was not in custody for the purposes of Miranda.  Thus, Trooper Merritt was not under an obligation to read the Defendant Miranda warnings prior to asking him if he had any money in his truck.

     Furthermore, having found the Defendant was not in custody and that the encounter had become a consensual one, the statements made by the Defendant were purely voluntary.  As noted above, voluntary statements-even those made without a Miranda reading-are admissible as long as they are given freely and voluntarily without compelling influences. McKenzie, 132 Fed. Appx. at 789-790.

### (b) Statements Made to Spec. Agt. Mullin

     After Spec. Agt. Mullin arrived at the location of the traffic stop, he approached the Defendant, identified himself, produced his credentials, and explained the nature of the investigation he was conducting.  He asked the Defendant if he would like to answer some questions for him regarding the cash found in his vehicle.  (Tr. 81:2-9).  It was at that time that he read the Defendant his Miranda warnings in English.  (Tr. 81:10-16).  The Defendant had been speaking fluent English with the officers.  (Tr. 81:18-19).  The Defendant appeared to understand the warnings and agreed to speak with Spec. Agt. Mullin.  (Tr. 81:21-25).  The Defendant contends that he was never advised of his Miranda rights.

The Court, in its credibility analysis, concluded that the testimony of Spec. Agt. Mullin and the other officers was more credible than that of the Defendant and Mrs. Barrueta. Having made that determination, the Court respectfully recommends that Spec. Agt. Mullin fully advised the Defendant of his Miranda rights. The Court further respectfully recommends that the Defendant waived those rights knowingly and voluntarily and that the Defendant's Statement should not be suppressed.

### (4) Whether the Search of the Defendant's Truck Violated the Constitution

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. v Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). The Defendant argues that he felt pressured into consenting to the search by the officers' presence. The Government responds that the Defendant gave his consent to allow the search when Trooper Merritt asked him if he could search his truck.

A search of property without a warrant or probable cause is proper under the Fourth Amendment when it is preceded by valid consent. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973). The voluntariness inquiry is a factual one assessed from the perspective of the "totality of the circumstances." U.S. v. Mohamed, 546 F. Supp. 2d 1324, 1332-1333 (M.D. Fla.2008) (citing Schneckloth, 412 U.S. at 227)). In evaluating the totality of the circumstances, a court should look at several "indicators": "the presence of coercive police procedures; the extent of the defendant's cooperation with the officer; the defendant's awareness of his right to refuse consent; the defendant's education and intelligence; and the defendant's belief that no incriminating evidence will be found." Mohamed, 546 F. Supp. 2d at 1333 (citing United States v. Simms, 385 F.3d 1347, 1355 (11th Cir.2004) quoting United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir.2001)). All these factors weigh against the Defendant.

At the time of the initial search by Trooper Merritt, the Defendant had been given his documents back and he had received his warning citation. (Tr. 33:17-20).  At that time, Trooper Merritt asked the Defendant specifically about having currency in his vehicle to which the Defendant replied that he had money in the vehicle.  When he was asked how much, the Defendant replied "approximately one hundred thousand dollars."  (Tr. 33:21-24).  Based upon the response, Trooper Merritt asked the Defendant if he could search his vehicle.  (Tr. 34:2).  The Defendant indicated that he could by stating "Absolutely, yes, go ahead."  (Tr. 34:3-4, 37:1-6).

Initially, "nothing in the Constitution prohibits a police officer who permissibly has stopped an individual from requesting permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband." U.S. v. Strickland, 902 F.2d 937, 941 n. 3 (11th Cir. 1990).  In this case, the duration of the search only lasted about twenty (20) seconds, Trooper Merritt located a large manila envelope in the center console area.  (Tr. 28:8-15).  Written in ball point pen on the outside of the envelope was 139,000.  (Tr. 38:18-21).  He looked inside the envelope to verify there was money inside, closed it, returned to his patrol car, and notified Spec. Agt. Mullin about his findings. (Tr. 38:22-25, 39:1-2).  At no time did Trooper Merritt threaten to get a search warrant if the Defendant refused to allow the search, and no threats were made in any way to coerce the Defendant into consenting to a search. (Tr. 37:17-23).

Although the Defendant argued that he was surrounded by officers who pressured him into the search, when Trooper Merritt originally searched the vehicle no other officers were present except Trooper St. Clair who was in training. (Tr. 61:9-11).  Trooper Merritt did not call Spec. Agt. Mullin until after he found the money.  Spec. Agt. Mullin arrived some two (2) to three (3) minutes later. (Tr. 38:22-25, 39:1-2).  By the time Trooper Grider arrived on the scene, Trooper Merritt already

had the package of money out of the truck. (Tr. 180: 23-24).  The search itself was quick, lasting only about twenty (20) seconds and it did not appear from the testimony and the evidence presented that there was any coercion on the part of Trooper Merritt to get the Defendant to give consent.

The fact that the Defendant so readily agreed to the search is a strong indication the Defendant did not believe anything illegal would be found in the vehicle. In fact, the Defendant told Trooper Merritt that he did not have anything illegal in the vehicle. (Tr. 60:16-18).  While the Defendant argued that he would have protested had he known he could, he made no such protests and he never testified that he actually refused to allow the search of his vehicle.  Therefore, all of the voluntary consent guidelines were met in this case and the Court respectfully recommends that the Defendant's Fourth Amendment rights were not violated by the search of the Defendant's truck.

In addition to Trooper Merritt's initial search, at which time he found the money envelope, the officers performed a second sweep of the truck's interior. (Tr. 58:17-19).  Trooper Merritt testified that he and Trooper Grider searched the truck's interior looking under the seats but that none of the interior was removed. (Tr. 58:16-18).  Trooper Merritt stated that he did not consider the second search as another separate search but as a continuation of the first search. (Tr. 59:1-3).

Trooper Merritt further believed, once the money was found that a crime had been committed. (Tr. 59:10-20).  He testified that was his belief based upon what Spec. Agt. Mullin had told him regarding his investigation, and the fact that the Defendant had a large quantity of cash and had no documentation. (Tr. 59:10-20).  Generally, once the purposes of the initial traffic stop are completed the officer cannot further detain a vehicle or its occupants unless something occurred during the traffic stop that created a reasonable suspicion to justify further detention. U.S. v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997).

In this instance, Trooper Merritt had reasonable suspicion to believe a crime had been committed.  The Defendant was in possession of a large amount of cash that he obtained from a company that was under investigation by the Government.  Trooper Merritt testified that based upon his knowledge of the Government's investigation, he believed the Defendant committed a crime. Therefore, the second sweep would not be a violation of the Fourth Amendment.

In addition, the search was in connection with the same incident and took place within a matter of minutes from the initial search conducted by Trooper Merritt.  Therefore, Trooper Merritt believed that he was still operating under the same consent offered by the Defendant when he first consented to Trooper Merritt's request to search the vehicle. (Tr. 59:1-7).  The Defendant never withdrew his consent.

The Defendant tries to argue that he acquiesced to the apparent authority of law enforcement rather than voluntarily consented to the search. The Defendant testified he felt that his vehicle was going to be searched - "They were going to do it." (Tr. 129:2-3).  He felt pressured.  (Tr. 129:15-20). He felt pressure because they told him if they searched the truck and found money things would really go bad for him. (Tr. 129:17-20).  When they asked him how much money he was bringing, he told them he had over a hundred thousand dollars.  (Tr. 129:23-23, 130:1-2).  They said they were going to go search the truck.  (Tr. 130:4-11).  The Defendant testified that the agent asked him if they could search his truck.  He responded that they already had him there, they were going to do it anyway. (Tr. 130:12-16). He testified that if he had a choice, he would not have let them search his vehicle.  (Tr. 130: 20-22).

While the Defendant states he felt pressured,  no one ever displayed a firearm, and Trooper Merritt stated that he never threaten to get a search warrant if the Defendant refused to allow the

search, and no threats were made to coerce the Defendant into consenting to a search. (Tr. 37:17-23). There are cases within this circuit that have approved a finding of voluntariness when a defendant was under far more coercive conditions than in the instant case.  For example, in <u>United States v. Long</u>, 866 F.2d 402 (11th Cir.1989), an investigation of a tip that defendant was involved in a counterfeiting conspiracy led officers to defendant's home. <u>U.S. v. Garcia</u>, 890 F.2d 355, 361 (11th Cir.1989).  The officers requested the defendant's consent to search for counterfeit currency they suspected was buried in the yard, and stated that if he refused they would return and "dig the place up." <u>Id.</u> (*citing* <u>Long</u>, 866 F.2d at 404). The Defendant consented. The court held that defendant's consent was voluntary. <u>Id.</u> The court opined, "Even if the officers stated that they could come back and 'dig the place up,' such a statement does not amount to coercion." <u>Id.</u> at 405. Furthermore, the mere presence of a uniformed officer with a holstered firearm should not be considered coercion because "the public knows that most officers are armed and many are required to wear uniforms." <u>U.S. v. Perez</u>, 443 F.3d 772, 778 n. 2 (11th Cir. 2006) (*citing* <u>U.S. v. Drayton</u>, 536 U.S. 194, 204-205, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)).  Thus, the Defendant's coercion  argument lacks merit.  Therefore, it is respectfully recommended the search of the Defendant's vehicle was proper and any evidence seized as a result should not be suppressed.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant Gabriel Barrueta's Motion to Suppress Statements and Evidence (Doc. #22) should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this __30th__ day of September, 2008.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record

-30-